## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
|      Plaintiff, ) | |
| ) | |
| vs. ) | Case No.  CR-08-079-F |
| ) | |
| ADAM RENE RICHARD, ) | |
| ) | |
|      Defendant. ) | |

## <u>ORDER</u>

Defendant Adam Richard's motion for judgment of acquittal is before the court. (Doc. no. 33.)  The government has responded, a reply brief has been filed, and the motion is ready for determination.

The jury convicted the defendant of possession of a firearm by an unlawful user of a controlled substance, in violation of 18 U.S.C. §922(g)(3).  Defendant now moves for a judgment of acquittal under Rule 29(c), Fed. R. Crim. P.  Under Rule 29, the court must uphold the jury's verdict of guilty if any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.  <u>United States v. Johnson</u>, 2003 WL 23096960 at *2 (D. Kan. 2003) (unpublished), citing <u>United States v. Haler</u>, 251 F.3d 881, 887 (10th Cir. 2001) (quoting <u>United States v. Schluneger</u>, 184 F.3d 1154, 1158 (10th Cir. 1999)).

Defendant makes two arguments in support of his motion.  First, he argues that § 922(g)(3) is unconstitutionally overbroad without a requirement (which he asserts was not satisfied in this case) that there be a physical nexus, *i.e.* geographic proximity, between the location of the drug use by the defendant and the location of the firearm possessed by the defendant.  Second, defendant argues he was denied due process of

law when the government interfered with his effort to preserve evidence because the government prevented defendant from making his own recording of his interview with law enforcement.

### 1. Section 922(g)(3) and Physical Nexus

The Tenth Circuit has recognized that § 922(g)(3) is not unconstitutionally vague for lack of a *temporal* nexus between the location of the drug use and the firearm possessed by the drug user, so long as "the government has introduced sufficient evidence of a temporal nexus between the drug use and the firearm possession." United States v. Edwards, 540 F.3d 1156, 1162 (10th Cir. 2008).  Other courts have also indicated that § 922(g)(3) is constitutional where a temporal nexus is present. *See*, *e.g.*, United States v. Edwards, 182 F.3d 333, 335-36 (5th Cir. 1999) (rejecting vagueness challenge to statute and affirming conviction where defendant admitted using marijuana on a daily basis for past two to three years).

Defendant's challenge, however, is not based on the statute's failure to require a more explicit temporal nexus, but on the argued absence of a physical nexus between the location of the drug use by the defendant and the location of the firearm. There are several problems with defendant's position.

First, defendant cites no case law to support his contention that §922(g)(3) is unconstitutionally vague absent the proposed physical nexus requirement.

Second, defendant argues that a physical nexus *must* be required, because otherwise, the statute "makes no sense."  (Doc. no. 33, p. 5.)  To support this argument, defendant describes hypothetical situations involving an unlawful drug user whose firearm is locked up miles away from where the illegal drug use occurs.  In such situations, defendant argues, a person might be "clean and sober at all times when in the proximity of a firearm," yet still guilty of violating § 922(g)(3). Defendant argues that criminalizing such conduct "makes no sense" because conduct

should only be criminalized when the illegal drug user is "in the proximity of the firearm while under the influence of drugs or when ... ingesting drugs." (Doc. no. 33, p. 5.)  This argument, however, would require difficult determinations by the finder of fact regarding a drug user's state of inebriation at the time the firearm was possessed.

Moreover, the court disagrees with defendant's premise that it "makes no sense" to criminalize an on-going illegal drug user's possession of a firearm, absent physical proximity between the drug use and the location of the firearm, or absent inebriation at the time of possession.  The relevant statutory language requires that, in this case, the firearm be possessed by "an unlawful user of...any controlled substance."  Jury instruction no. 17 instructed the jury that "an unlawful user of a controlled substance" is "an individual who, on a regular and on-going basis, uses a controlled substance in a manner other than that prescribed by a licensed physician." (Doc. no. 31, p. 19.)  A person who illegally uses controlled substances on a regular and on-going basis is in a class of persons more likely than a class of non-users to have, at any given time, impaired judgment.  Such a person is more likely than a non-user to act erratically, irresponsibly or dangerously.  Given these realities and the dangerousness of firearms, it makes good sense[1] to criminalize the possession of a firearm by a person who is an on-going user of illegal drugs.

Indeed, the Supreme Court has recognized that such concerns underlie the Gun Control Act of 1968, 18 U.S.C. § 921 et seq., of which § 922(c)(3) is a part.  In Barrett v. United States, 423 U.S. 212, 220 (1976), the Court described the purpose and history of the Act as follows.

---

[1] Of course, judicial review of the constitutionality of this legislation is not governed by a "good sense" standard.  The bar is significantly lower.

> The very structure of the Gun Control Act demonstrates that Congress did not intend merely to restrict interstate sales but sought broadly to keep firearms away from the persons Congress classified as potentially irresponsible and dangerous. These persons are comprehensively barred by the Act from acquiring firearms by any means. *** The history of the 1968 Act reflects a ... concern with keeping firearms out of the hands of categories of potentially irresponsible persons, including convicted felons. Its broadly stated principal purpose was to make it possible to keep firearms out of the hands of those not legally entitled to possess them because of age, criminal background, or incompetency.

423 U.S. 212 at 219-20. A person who regularly uses drugs in an illegal manner belongs to a class of persons who are potentially irresponsible and dangerous. Thus, with or without a physical nexus, it makes sense to criminalize possession of a firearm by a regular user of illegal drugs.

Moreover, the explicitly-articulated requirement[2] of a temporal nexus between the defendant's on-going illegal drug use and his possession of a firearm alleviates, to some degree, concerns which might otherwise exist regarding the argued absence of any physical nexus between the location of defendant's drug use and the location of the firearm.

For these reasons, the court rejects defendant's argument that § 922(c)(3) is unconstitutionally vague because it does not require a physical nexus between the use of illegal drugs and the location of the firearm.

2. <u>Denial of Permission to Record the February 8 interview</u>.

The defendant's room in his parent's home was searched, and the rifle in question was seized, on January 27, 2006. Tr. 10, 15, 107.[3] Twelve days later, on February 8, defendant was interviewed in a conference room at the Stephens County

---

[2] The relevant language from the jury instructions in this case is quoted in note 5, below.

[3] "Tr." citations are to the transcript of the jury trial, held on June 4 and 5, 2008.

Sheriff's office by a Stephens County Sheriff's Deputy, two Drug Enforcement Administration investigators, and a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.   Defendant brought a tape recorder to that meeting, but the ATF agent denied permission to record the interview.  Tr. 24, 104, 108.

In the motion now before the court, the defendant asserts that the denial of permission to record the February 8 interview at the Sheriff's office amounted to a denial of due process of law.  The remedy he seeks is an order striking the testimony of the agents as to what he said at the February 8 interview – with the result that there would be a failure of proof as to an essential element of the offense charged in the indictment.

Evaluation of this claim requires a thorough understanding of the events that transpired on February 8 and of the proceedings at the trial of this case.

The February 8 meeting at the Sheriff's office was attended by Stephens County Deputy Sheriff Rodney Richards, DEA diversion investigators Ginger Crowder and John Kushner, ATF Agent James Nunley, and the defendant.  Tr. 77.  Agent Nunley made the arrangements for the meeting.  Tr. 97.  Defendant was brought to the meeting by his stepfather.  The stepfather waited in the lobby during the meeting.  Tr. 97.  Agent Nunley assured the defendant that he was free to leave at any time.  Tr. 98. At trial Mr. Richards, Ms. Crowder and Agent Nunley testified about the February 8 meeting.  Although there was testimony at trial about certain aspects of defendant's physical appearance that suggested drug use (*e.g.*, Tr. 38-39, 110-11), and about the drug-related items found in defendant's bedroom when the search was conducted on January 27 (*e.g.*, Tr. 101-02), no witness claimed the ability to evaluate the observed features with precision sufficient to support an inference as to the temporal proximity between Mr. Richard's use of methamphetamine and his possession of the rifle that

was found in his bedroom.  The evidence at trial would not, without the testimony about defendant's admissions during the interview at the Sheriff's office, support a jury finding against the defendant on the temporal element of the § 922(g)(3) charge. The government does not contend otherwise.

<u>Rodney Richards</u>.  At the time of the February 8 meeting, defendant was not under arrest, and had not been charged with anything.  He was just invited by Agent Nunley "to come down and have a little talk."  Tr. 34.  Deputy Richards, who was present for the entire meeting, estimated that the meeting lasted approximately an hour and  forty-five minutes.  Tr. 26, 32.  Deputy Richards had no recollection as to whether defendant brought a tape recorder with him.  Tr. 34.

Deputy Richards recalled that, at this meeting, defendant admitted that there had been periods of time when he used methamphetamine every day, and there were periods of time that he would use it every other day.  Tr. 40-41.  Defendant, to Deputy Richards' recollection, said that he had last used methamphetamine "a couple of days prior to that [Feb. 8] interview" at a bar in the Oklahoma City area, Tr. 26, which, it should be noted, would have been about ten days after defendant last possessed the rifle that provided the basis for the prosecution.  Deputy Richards had no recollection as to whether anyone at the meeting asked the defendant "when the last time was before [the use at the bar in Oklahoma City]."  Tr. 42.  Thus, Deputy Richards could not quote defendant as having said whether his last use was "30 days, 60 days, 90 days, six months [previous to the Oklahoma City use]", nor could he quote any of his law enforcement colleagues as having even asked about that.  *Id.*[4]  This, at a minimum, severely limited the likelihood that Deputy Richards' testimony could have

---

[4] It should be borne in mind that the indictment charged that defendant "is an unlawful <u>user</u>." Doc. No. 1. at 1 (emphasis added).  Thus, the government did not charge the defendant with violating the "is . . . addicted" prong of § 922(g)(3).

provided a basis for a finding that the defendant "possessed the firearm during the same time period that he was a regular and ongoing unlawful user of a controlled substance," as required by the jury instructions.  See doc. no. 31, Instruction No. 17.[5]

This left the government with three potential witnesses remaining to give testimony to prove the temporal element of the offense.  Two of those individuals testified at trial, after Deputy Richards completed his testimony.

Ginger Crowder.  DEA investigator Ginger Crowder attended the interview and took handwritten notes, from which she later prepared a report. Tr. 78-79.  She testified that she  assumed that she took notes during the entire interview. Tr. 90. She had no recollection as to whether the defendant brought a tape recorder with him. Tr. 83-84.  She had no knowledge as to whether DEA policy prohibited the recording of interviews, although she allowed that a recording would produce a more reliable record than a report based on notes.  Tr.  84-87.

As to drug use, Ms. Crowder quoted the defendant as acknowledging that he had used methamphetamine "for approximately three to four years," the last instance

---

[5] The relevant portion of this instruction, defining the temporal element of the offense charged, states as follows:

> For the defendant to possess a firearm "while" he was an unlawful user of a controlled substance does not require that the defendant used the controlled substance at the precise time he possessed the firearm. The defendant is not required to have used illegal drugs on a particular day, or within a matter of days before the possession of the firearm. Nor is the defendant required to have been under the influence of an illegal drug at the exact same time that he possessed the firearm.

The court's explanation of the temporal element, as set forth in this instruction, was based on numerous cases from our circuit, not the least of which is United States v. Bennett, 329 F.3d 769 (10th Cir. 2003), which explained that, in a prosecution of an alleged unlawful user under § 922(g)(3), the government must show that the defendant's unlawful drug use was "contemporaneous  with his firearm possession" but need not show that the use was "simultaneous" with the possession.  Id. at 776-77.

of which was "a couple of days" before the interview (consistent with Deputy Richards' testimony). Tr. 80. As has been noted, that last use would have been about ten days after defendant last possessed the rifle that provided the basis for the prosecution. She quoted defendant as saying that he "does bumps" only when people give it to him. Tr. 88. Significantly, Ms. Crowder, having participated in the entire interview, and having taken notes during the entire interview, had no recollection of any other statements made by the defendant as to use of methamphetamine, including, specifically, any other statements as to the "frequency or timing" of his use. Tr. 81, 88-90.

James Todd Nunley.  Agent Nunley was the last witness to testify about the February 8 meeting. He acknowledged that defendant brought a tape recorder to the meeting, and that defendant asked to record the interview, but that he, Nunley, told defendant that he could not record the interview. Tr. 108. Agent Nunley explained that his concern for defendant's safety was the reason that he told defendant that he could not record the interview. Tr. 104. As for recording at the instance of the interviewer, as opposed to the interviewee, Agent Nunley testified that although he was not aware of any ATF policy precluding recording of interviews, his personal practice was not to record interviews. Tr. 104-05, 109-110. Agent Nunley maintained that a recording of what was actually said would not be more helpful to the finder of fact than would be his testimony, based on his notes, because his notes "memorialize exactly" what was said. Tr. 110, 112. He prepared his report, based on his notes, the day after the interview. Tr. 123.

As to defendant's admissions about his use of methamphetamine, the testimony of Mr. Nunley, the case agent, was in some ways consistent with the testimony of the other two witnesses who testified about the interview, and in some says markedly inconsistent. Consistently with the testimony of Deputy Richards and Investigator

Crowder, Agent Nunley testified that defendant said that his last use had been "a couple of days" before the interview at the Sheriff's office. Tr. 102, 113. Although Agent Nunley stopped short of specifically asking defendant when his last use was before the seizure of the rifle, Agent Nunley quoted defendant as admitting "that he used every day or every other day and had done so over the past three to four years." Tr. 100, 113-14. This contrasts with the testimony of Ms. Crowder. As has been noted, Ms. Crowder, testifying on the basis of the notes she took during the entire interview, said that her recollection was that, aside from saying that he only "does bumps" when people give it to him, defendant said nothing about the frequency or timing of his use of methamphetamine.

Agent Nunley could shed little light on the reason for the difference between his account and that of Ms. Crowder:

> Q. Can you explain why your recollection of the frequency and the amount of use of methamphetamine is different than Ms. Crowder, the agent who we heard from?
>
> A. I'm not sure why she put what she did down, but I know that the information that Mr. Richard provided is what I wrote down.
>
> Q. Do you think you were trying to be more detailed than she was or that she wasn't doing a good job?
>
> A. I'm not going to say that she does a good or bad job. Like I said, this is something I've done for 22 years, so --
>
> Q. Well, evidently she didn't hear it the same way you did, did she?
>
> A. Apparently not.

Tr. 121.

_____

In this case, three law enforcement officers, including a federal agent and a federal investigator, testified about the interview at the Sheriff's office. One of those witnesses, Agent Nunley, gave an account of the interview which would be sufficient

to convict.  One of those witnesses, Ms. Crowder, gave testimony which would not just fall short of satisfying the temporal requirement – it would, if credited, undermine the testimony of Agent Nunley in support of that requirement.  The testimony of the third witness, Deputy Richards, fell into the middle ground.  He gave very general support to Agent Nunley's account of the duration and frequency of defendant's use of methamphetamine, but, as noted, could not attribute to defendant any statement as to whether his last use was 30 days, 60 days, 90 days or six months before the Oklahoma City use a couple of days before the interview at the Sheriff's office, and could not quote Crowder, Nunley or Kushner as having even asked about that.

The case went to the jury on the basis of evidence fraught with material uncertainties which clearly would not have existed if the defendant had not been prohibited by Agent Nunley from recording the interview.

Defendant argues that "he was denied due process of law by the government agents' intentional failure to preserve evidence they knew was relevant to imminent litigation."  Doc. 33, at 6.  Defendant then proceeds to analyze the due process issue within the framework of a reasonably well developed body of law relating to spoliation of evidence.  *Id.* at 6-9.

It goes without saying, but perhaps should nevertheless be said, that there is no contention in this case that the government had an affirmative duty to record the February 8 interview.  An argument to that effect would not be supportable by extant authority from the Supreme Court or the Tenth Circuit.  The due process issue raised by defendant's motion arises from the fact that the government prohibited the making of a recording which, Agent Nunley's testimony notwithstanding, would have

provided the most reliable record of defendant's statements and of the context in which those statements were made.[6]

Regardless of whether defendant's due process argument is analyzed with, or without, an overlay of spoliation law, defendant, in order to prevail, must establish that the government acted in bad faith.  This much is clear from Arizona v. Youngblood, 488 U.S. 51 (1988).  In Arizona v. Youngblood, the Supreme Court was called upon to decide whether the Due Process Clause of the Fourteenth Amendment (which, for present purposes, this court regards as analytically equivalent to the Due Process Clause of the Fifth Amendment) required reversal of a conviction where the state had negligently failed to preserve potentially exculpatory evidence.  Thus, Arizona v. Youngblood presented a different case than was before the court in Brady v. Maryland, 373 U.S. 83 (1963), because the evidence which was withheld in Brady was exculpatory whereas the evidence which was lost in Arizona v. Youngblood was only potentially exculpatory.  Arizona v. Youngblood, 488 U.S. at 54-55.  The court declined to extend its Brady holding that due process was violated "irrespective of the good faith or bad faith of the prosecution," 373 U.S. at 87, to the situation before it, in which it was not known, and could not have been determined, whether the evidence which was lost could have been exculpatory:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in Brady [v. Maryland, 373 U.S.83 (1963)], makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence.  But we think the Due Process Clause

---

[6] To be sure, tape recordings of conversations are not always entirely intelligible.  This problem frequently arises in situations in which the recording is, of necessity, made under less than ideal circumstances, such as where the microphone is concealed in clothing or located at a significant distance from the participants in the conversation or when the conversation being recorded must compete with substantial background noise.  There has been no suggestion in this case that a simple handheld tape recorder sitting on a table in a quiet conference room would not have produced an intelligible record of the conversation.

requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.   Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta*, *supra*, 467 U.S., at 486, 104 S.Ct., at 2532, that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed."   Part of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause, see *Lisenba v. California*, 314 U.S. 219, 236, 62 S.Ct. 280, 289, 86 L.Ed. 166 (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.   We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.   We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

488 U.S. at 58 - 59.

In the case at bar, as in <u>Arizona v. Youngblood</u>, there has not been, and cannot be, a showing that Agent Nunley's prohibition of tape recording deprived the defendant of the benefit of exculpatory evidence.  By Agent Nunley's account, a tape recording would have made no difference.  The testimony of Deputy Richards and Investigator Crowder tends, to some degree, to raise questions about Agent Nunley's estimation of his proficiency versus that of a tape recorder, but there has been no showing that a recording, if made, would have been exculpatory.  Consequently, applying the distinction recognized by the Court in <u>Arizona v. Youngblood</u>, the court concludes that bad faith must be shown.

-12-

Having carefully considered all of the evidence before it, the court stops short of finding actual bad faith on the part of Agent Nunley or his colleagues. At the time he prohibited the recording, Agent Nunley could not have known with any certainty whether he was avoiding the creation of exculpatory evidence. In bringing defendant to the table, prohibiting recording, and eliciting admissions, Agent Nunley was probably maximizing the leverage that his badge gave him, but that does not amount to actual bad faith.

If the due process required complete good faith, rather than bad faith, my conclusion would likely be different. The federal agent and investigators knew exactly what they were doing when they invited defendant to the Sheriff's office. They hoped to walk out of the conference room with the indictable case that they didn't have when defendant walked in. It worked. A little more than two years later, defendant was indicted.

When he was invited to come to the Sheriff's office, defendant knew he was in trouble, and may even have been resigned to the fate that ultimately befell him at trial. Even so, he at least wanted to take a commonsense precaution against any misunderstanding of what he might say at the Sheriff's office. But Agent Nunley chose not to incur the risk of an indisputably accurate record of the interview. Although I cannot find outright bad faith, I do find that, under all the circumstances, the government's treatment of defendant was high-handed and arrogant. Left to my own devices, I would likely conclude that, in these circumstances, relief should be granted even in the absence of a showing of actual bad faith. Perhaps consideration of this issue by a reviewing court will lead to that result.[7]

---

[7] The court is considering delaying incarceration of defendant (if the court determines that incarceration is appropriate) until appellate proceedings have been completed. Counsel should be prepared to address this aspect of the case at sentencing.

<u>Conclusion</u>

After careful consideration, defendant's motion for judgment of acquittal is **DENIED**.  This case will promptly be set for sentencing.

Dated this 14th day of October, 2008.

_____
STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

08-0079p009(pub).wpd